JUDGE DANIELS

08 CV 7373

Robert L. Powley (RP7674)
James M. Gibson (JG9234)
David J. Lorenz (DL3072)
Jason H. Kasner (JK 1414)
Hewson Chen (HC1608)
Powley & Gibson, P.C.
304 Hudson Street 2nd Floor
New York, New York 10013
Telephone: (212) 226-5054
Facsimile: (212) 226-5085

Attorneys for Plaintiffs
Energy Intelligence Group, Inc. and
Energy Intelligence Group (UK) Limited




UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ENERGY INTELLIGENCE GROUP, INC. and ENERGY INTELLIGENCE GROUP (UK) LIMITED | Civil Action No. |
| Plaintiffs, | **COMPLAINT FOR COPYRIGHT INFRINGEMENT** |
| -against- | |
| CITIGROUP GLOBAL MARKETS, INC., | ECF |
| Defendant. | |

**COMPLAINT**

Plaintiffs Energy Intelligence Group, Inc. (hereinafter "EIG") and Energy Intelligence Group (UK) Limited (hereinafter "EIG UK") (hereinafter collectively "Plaintiffs"), by and through their undersigned counsel, allege the following for their Complaint against Defendant

Citigroup Global Markets, Inc. (hereinafter "Defendant") based on personal knowledge and on information and belief, as appropriate:

## JURISDICTION AND VENUE

1. Plaintiffs bring this action under the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.* (hereinafter "the Copyright Act") against Defendant for, *inter alia*, willful infringement of Plaintiffs' registered copyrights.

2. This Court has jurisdiction pursuant to Sections 501, *et seq.* of the Copyright Act and 28 U.S.C. §§ 1331 and 1338(a) over causes of action alleging copyright infringement.

3. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(c) and 1400(a), and N.Y. C.P.L.R. § 503(c), as Defendant is a corporation that is incorporated in the State of New York, is registered to do business in the State of New York and is doing business in this district such that it is deemed to reside in this district for purposes of venue.

## THE PARTIES

4. Plaintiff EIG is a Delaware corporation with a principal place of business located at 5 East 37th Street, New York, NY 10016-2807.

5. Plaintiff EIG UK is a United Kingdom limited company with a principle place of business located at Holborn Tower, 8th Floor, 137-144 High Holborn, London, WC1V 6PW United Kingdom.

6. Upon information and belief, Defendant is a New York corporation with a place of business at 388 Greenwich Street, New York, New York, 10013, and is registered to do business and is doing business in New York State.

## FACTS COMMON TO ALL COUNTS

### A. Plaintiffs' Publications

7. Plaintiffs and their predecessors-in-interest have been engaged in publishing newsletters and other publications for the highly-specialized global energy industry for over fifty-seven (57) years.

8. In particular, since 1951, Plaintiffs have published the daily newsletter *Oil Daily* (hereinafter "OD"). The focus of OD is to provide original in-depth articles regarding significant industry events and trends, as well as new and forthcoming policy and legislation changes, corporate mergers, international events, technology advances, and activities in the crude and products markets affecting the fast-paced oil industry. Additionally, OD articles also provide valuable news and pricing information and related analysis of matters affecting oil prices. A copy of the June 13, 2008 edition of *Oil Daily* (hereinafter the "OD Work") is attached hereto as Exhibit A.

9. The elite audience for OD consists predominantly of top oil executives, bankers, investors and analysts in the United States, Canada, Europe and Latin America and other countries throughout the world.

10. Plaintiffs have invested significant time and resources to develop their publications and services, including OD. Plaintiffs' focus is on providing original, high quality articles and analysis relating to the oil and gas industry.

11. Plaintiffs maintain an editorial staff of approximately fifty (50) reporters, editors, and analysts at seven (7) editorial bureaus located in New York, Washington, D.C., Houston, London, Moscow, Dubai and Singapore.

12. The original content and information gathered by Plaintiffs and included in OD and their other publications are valuable assets. Plaintiffs also publish the following original publications in addition to OD:

Serial Publications

*Energy Intelligence Briefing*;

*Petroleum Intelligence Weekly*;

*Energy Compass*;

*Uranium Intelligence Weekly*;

*Nefte Compass*;

*Oil Market Intelligence*;

*Jet Fuel Intelligence*;

*Natural Gas Week;*

*International Oil Daily*;

*International Petroleum Finance*;

*World Gas Intelligence*; and

*NGW's Gas Market Reconnaissance.*

International Services

*Oil Market Intelligence Numerical Data Source*;

*Natural Gas Week Numerical Data Source*;

*World Gas Intelligence Numerical Data Source*; and

*Petroleum Intelligence Weekly Numerical Data Source.*

Research & Reference Works

*Almanac of Russian and Caspian Petroleum* (multiple years);

*Asia-Pacific Refined Products*;

*International Crude Oil Market Handbook* (multiple years);

*The Energy Intelligence Top 100: Ranking the World's Oil Companies* (multiple years);

*World Gas Handbook* (multiple years);

*High Oil Prices: Causes and Consequences*;

*World LNG Review*;

*Libya Oil & Gas: Competition Heats Up*;

*Oil Supply Dilemma: Needs of Major Oil Exporters*;

*Understanding the Oil and Gas Industries*; and

*Iraq Oil and Gas: A Bonanza Still in Waiting.*

13. Plaintiffs have developed an invaluable reputation for their extremely high standards and the reliability of the information and analysis contained in OD as well as in their other publications.

14. In view of the extensive research efforts and expertise required for OD and Plaintiffs' other publications, Plaintiffs provide various subscription plans for interested parties to purchase OD and their other publications and access the valuable information contained therein.

15. Interested third parties have various subscription options depending on their particular needs. Subscribers may obtain OD by print, fax, email and/or from Plaintiffs' website, which permits password-protected access to current and/or archived issues. Interested third parties may also purchase individual articles appearing in OD as well as archived issues from Plaintiffs.

16. Plaintiffs have also historically provided, and continue to provide today, the ability for their subscribers to access individual articles appearing in OD through their website. The license fee for this service is based on the number of users for the requested article.

17. Plaintiffs provide copyright notice on their website, invoices, emails, transmittal letters, articles and publications so that third parties are aware of Plaintiffs' rights in the publications and works of original authorship. Plaintiffs are the owners of U.S. Copyright Registration No. TX 6-648-007 for Edition 58 for the OD issues dated June 2, 3, 4, 5, 6, 9, 10, 11, 12, 13, 16, 17, 18, 19, 20, 23, 24, 25, 26, 27 and 30, 2008. A copy of said registration is attached hereto as Exhibit B.

18. Plaintiffs provide a comprehensive copyright notice that appears within all publications, including the OD Work (hereinafter, the "Copyright Notice"), which states, "[a]ccess, distribution, and reproduction are subject to the terms and conditions of the subscription agreement and/or license with EIG. Access, distribution, reproduction or electronic forwarding not specifically defined and authorized in a valid subscription agreement or license with EIG is willful copyright infringement." See Exhibit A.

**B. Defendant's Business Relationship And Contractual Agreement With Plaintiffs**

19. Defendant has subscribed to various publications published by Plaintiffs since at least 2004. The terms of Defendant's subscription have been governed by a site license in the form of a Master License Agreement (hereinafter "the Agreement") that has been renewed annually by an addendum titled "Schedule A." A copy of the Agreement dated September 13, 2004, including a Schedule A dated September 13, 2004, a Schedule A dated July 23, 2007 and a Schedule A dated April 17, 2008, is attached hereto as Exhibit C.

20. Schedule A identifies, in relevant part, the publications being licensed, the term of each license for each publication, the names of the individual authorized users for each publication

and the delivery method for each publication. The licensed publications and the authorized users have changed over the years. However, the Schedule A dated July 23, 2007 provided a license for one user for OD, with a term extending from July 3, 2007 to July 2, 2008. The Schedule A dated July 23, 2007 identifies two authorized users, Faisel Khan and Geoff Kieburtz, who on information and belief are employees of Defendant, and a contact person, Alison Faustin, who on information and belief also is an employee of Defendant. Finally, the Schedule A dated July 23, 2007 specifies that OD is to be delivered to the authorized users as a PDF file via email. See Exhibit C.

21. Paragraph 3.0 of the Agreement states that Defendant "is permitted to use, provide and distribute (orally, in writing, electronically or otherwise) to its Licensees and suppliers and for its own business applications, reports, presentations, analytics, formulae, graphs, algorithms and other publications which incorporate, utilize or display *excerpts* of text or data contained within the publications [specified in Schedule A attached to the Agreement]." See Exhibit C (emphasis added).

22. Paragraph 3.0 of the Agreement further provides that Defendant "is strictly prohibited from reproducing or copying (photo statically, electronically, by means of forwarding electronically, via facsimile or otherwise) entire issues, or systematically or routinely extracting or printing stories and distributing such copies and/or extracted stories (including without limitation, posting on local area or wide area networks) to individuals or entities who are not [authorized users], or otherwise acting in violation of United States copyright laws." See Exhibit C.

23. The Copyright Notice in each issue of OD provides that any "access, distribution, reproduction or electronic forwarding not specifically defined and authorized in a valid subscription agreement or license with EIG is willful copyright infringement." See Exhibit A.

24. No subscription agreement or any other agreement authorizes Defendant to reproduce, copy or distribute OD to individuals or entities who are not authorized users.

C. **Defendant's Improper Use of Plaintiffs' Copyrighted Publications**

25. Upon information and belief, on or about June 13, 2008, Susan Healy ("Healy"), who on information and belief is an employee of Defendant, distributed copies of the OD Work to at least four (4) individuals who are not authorized users identified in the Schedule A dated July 23, 2007. Plaintiffs learned of this through a June 13, 2008 email (hereinafter "the Email") that Healy forwarded to EIG. The email chain incorporating the Email indicates that Healy first received the Email from Frances Petito ("Petito"), who on information and belief is an employee of Defendant. The subject line of the Email is "Oil daily – GK has subscription." Upon information and belief, "GK" refers to Geoff Kieburtz, also an employee of Defendant. Upon information and belief, an electronic PDF file of the OD Work is attached to the Email. In the Email, Petito instructs Healy that "[e]mails should go to Faisel and Robin when these arrive daily. Richard and Jason want hard copies, so copy for them and put on their desks." The Email further states "[l]imit the # of email sent, as this is not supposed to be emailed in the first place." A copy of that certain June 13, 2008 email is attached hereto as Exhibit D.

26. Upon information and belief, after Healy learned the Email was sent to a representative of Plaintiffs, the Email was immediately recalled in an effort to further conceal the willful unauthorized distribution of OD by Defendant.

27. Upon information and belief, Defendant willfully undertook to copy, exhibit, transmit, display and distribute the OD Work without permission from Plaintiffs.

28. Defendant has not entered into any agreement or relationship with Plaintiffs that would allow Defendant to copy, exhibit, transmit, display and distribute and/or otherwise use the OD Work in the manner described above.

**COUNT ONE**
**COPYRIGHT INFRINGEMENT OF THE OD WORK**

29. Plaintiffs repeat and allege Paragraphs 1-28 as though fully set forth herein.

30. Plaintiffs were and are the exclusive holders of all rights, title and interest in the OD Work and articles contained therein and are the owners of a valid copyright in the OD Work, as shown in U.S. Copyright Registration No. TX 6-648-007. See Exhibit B.

31. The articles contained in the OD Work are highly original and contain creative expression and independent analysis.

32. Copies of the OD Work were sent to Defendant under the Agreement.

33. Upon information and belief, employees of Defendant sent copies of the OD Work to individuals who are not authorized users identified in the Schedule A dated July 23, 2007. See Exhibit C.

34. Plaintiffs became aware of Defendant's infringement of the OD Work through an e-mail dated June 13, 2008 that they received from Healy. Healy's email indicated that Defendant was willfully forwarding and/or reproducing the OD Work to at least four (4) individuals who are not authorized users. See Exhibit D.

35. Upon information and belief, Defendant copied, exhibited, transmitted, displayed and distributed the OD Work to numerous individuals, without implied or express authority, nor with Plaintiffs' express and/or implied permission.

36. Plaintiffs did not grant Defendant any right to copy, exhibit, transmit, display and/or distribute the OD Work or any issue of OD in its entirety and/or beyond the use permitted pursuant to the Agreement. The terms of the Copyright Notice in the OD Work that Defendant received state that "access, distribution, reproduction or electronic forwarding not specifically defined and authorized in a valid subscription agreement or license with EIG constitutes willful copyright infringement." See Exhibit A.

37. The Agreement prohibits any reproduction, copying or distribution of any issue of OD or any articles contained therein to individuals or entities who are not authorized users identified in Schedule A to the Agreement. See Exhibit C.

38. Upon information and belief, Plaintiffs now believe that Defendant has continually and systematically distributed Plaintiffs' publications to individuals who are not authorized users since at least 2004.

39. Upon information and belief, Defendant willfully infringed the copyrights in the OD Work by copying, exhibiting, transmitting, displaying and distributing the OD Work beyond the use permitted pursuant to the Agreement, without permission and/or authorization express or implied from Plaintiffs, and Defendant's employees knew that such actions were willful. See Exhibit D.

40. Defendant's aforesaid acts violate Plaintiffs' exclusive rights under § 106 of the Copyright Act of 1976, 17 U.S.C. § 106, as amended, and constitute willful infringement of Plaintiffs' copyrights in the OD Work. Defendant's past and continuing copying, exhibiting, transmitting, displaying and distributing of the OD Work constitute a willful, deliberate and ongoing infringement of Plaintiffs' copyrights and are causing irreparable harm and damage to Plaintiffs.

41. Plaintiffs have no adequate remedy at law.

**JURY DEMAND**

Plaintiffs hereby demand a jury trial.

WHEREFORE Plaintiffs demand judgment against Defendant on the foregoing claim as follows:

(1) That Defendant, its directors, officers, agents, subsidiaries and affiliates and all persons acting by, through, or in concert with any of them, be permanently enjoined from using and infringing the copyright and/or copyrights of Plaintiffs in any manner, and from copying, exhibiting, transmitting, displaying, distributing or preparing derivative works from any of the copyrighted material in any of past, present or future OD articles;

(2) That Defendant be required to pay to Plaintiffs such actual damages as they have sustained as a result of Defendant's copyright infringement pursuant to 17 U.S.C. § 504;

(3) That Defendant be required to account for and disgorge to Plaintiffs all gains, profits, and advantages derived by its copyright infringement pursuant to 17 U.S.C. § 504;

(4) That Defendant be required to pay Plaintiffs an increase in the award of statutory damages due to Defendant's willful infringement pursuant to 17 U.S.C. § 504(c)(2);

(5) That the Court issue an Order requiring Defendant to hold harmless and indemnify Plaintiffs from any claim(s) raised by any third party who allegedly relied upon any of Plaintiffs' publications it received as a result of Defendant's unauthorized use of Plaintiffs' copyrighted materials;

(6) That the Court enter judgment against Defendant in favor of Plaintiffs for all claims, including pre- and post-judgment interest, as allowed by law;

(7) That the Court enter judgment against Defendant finding that its unlawful copying and dissemination of OD is willful;

(8) That Defendant be ordered to pay to Plaintiffs their costs in this action along with reasonable attorneys' fees; and

(9) That Plaintiffs be granted such further relief as the Court deems just.

Respectfully submitted,

POWLEY & GIBSON, P.C.

Dated: August 20, 2008

By: ______________________

Robert L. Powley (RP7674)
James M. Gibson (JG9234)
David J. Lorenz (DL3072)
Jason H. Kasner (JK 1414)
Hewson Chen (HC1608)

304 Hudson Street 2nd Floor
New York, New York 10013
Telephone: (212) 226-5054
Facsimile: (212) 226-5085

Attorneys for Plaintiffs
Energy Intelligence Group, Inc. and
Energy Intelligence Group (UK) Limited

# EXHIBIT A

Energy Intelligence

Vol. 58, No. 114, Friday, June 13, 2008

Copyright © 2008 EIG. Unauthorized access or electronic forwarding, even for internal use, is prohibited




# Congress Weighs Anti-Speculation Measures

If there is a glimmer of hope for compromise in the partisan energy policy battles in Congress, it is to be found in the effort to curb the role of speculators in energy markets.

Senate leaders are currently preparing bipartisan energy legislation that would deal exclusively with market speculation. An aide to Sen. Ted Stevens (R-Alaska) said the bill is likely to be introduced next week.

The legislation is being cosponsored by Sens. Stevens and Dianne Feinstein (D-Calif.), among others. Details about the bill are not yet known but previous discussions have included requiring an increase in the amount of money that has to be put down to trade in energy markets.

Democrats have also signaled a willingness to increase funding for the Commodity Futures Trading Commission (CFTC), which is in charge of regulating trading in the energy markets.

Lawmakers on both sides of the aisle believe excessive speculation is contributing to the rise in crude oil prices. So far this year, they have agreed on little else.

Congress wants to close a loophole in current federal regulation by empowering the CFTC to impose speculative limits on US traders who use foreign exchanges.

The CFTC already places limits on speculative energy trades, but speculators can avoid those limits by moving their holdings beyond the country's borders.

The Commodity Exchange Act limits speculative positions in the oil market to a total of 20 million barrels and 3 million bbl in the last three days of a futures contract. However, the CFTC does not impose limits for institutional investors dealing on overseas markets.

Energy analysts and economists have blamed the run-up in prices on increased demand from China and India and shrinking supply, but Congress has increasingly focused on the role of speculators as soaring gasoline prices have continued to squeeze consumers' pocketbooks.

Concern among lawmakers has grown as hedge funds, pension funds and other institutional investors have moved into the energy commodities market to guard against the risk of an underperforming stock market and the falling dollar.

The CFTC recently revealed it was investigating the role of speculation in the oil futures markets and was stepping up cooperation with foreign markets, such as the London exchange operated by Atlanta-based InterContinental Exchange (ICE), which falls largely outside the scope of US regulators.

The CFTC has asked the UK's Financial Services Authority to set limits on speculative trading of front-month West Texas Intermediate crude contracts on ICE, Dow Jones reported on Thursday.

The agency also held a meeting earlier in the week with bankers and traders to discuss speculation in the energy markets,

**(See Congress, page 2)**

## News in Review

**In This Issue:**

Shell Seeks Iraq Gas Agreement .......2
Oil Prices Inch Higher ..............3
Alaska Rejects Exxon's Plan ...........4
Chevron, Transneft in Pipeline Deal ....4
Eni Strikes New Terms in Libya ........5
Suncor Expands Ethanol Plant .........6
Saudis Raise Oil Prices to US ..........6
Grey Wolf Rejects Takeover Bid ........6
Marathon Names Renewables Executive ..7

## Latest Market Trends

### Crude & Gas Futures

(Nymex 1st Month)

$/bbl — $/MMBtu

--- Natural Gas
— Light Sweet

5/7 5/14 5/21 5/29 6/5 6/12

### Oil & Gas Shares




# Venezuela Economy Slows Despite Oil Bonanza

Venezuela's leftist President Hugo Chavez has announced a package of measures intended to jump start the economy and rein in escalating inflation. The initiative follows a sharp drop in economic growth and a slump in investment expenditure during the first quarter of 2008.

Venezuela's economic growth slowed down to a year-on-year rate of 4.8% in the first quarter of 2008 from 8.5% in the fourth quarter of 2007, despite skyrocketing oil prices.

The inflation rate during the first five months of this year has been estimated at 12%, and is expected to rise to around 30% by the end of the year.

Chavez, unveiling the economic stimulus package on Wednesday, said Venezuela's oil revenues should reach $75 billion this year. He suggested that $100 per barrel is "a fair price" for crude oil, somewhat lower than crude's recent trading range of $130 to $140.

The stimulus package announced by the president included a commitment to increase government spending, which slowed down in the first half of the year in an effort to dampen inflation.

The National Assembly has already approved $9.6 billion in additional spending, on top of the $64 billion already contained in the national budget for this year.

Off-budget government spending is likely to increase substantially this year, according to a report by investment bank Credit Suisse. Most of this spending will be channeled through state oil company Petroleos de Venezuela (PDV) and the national development fund known as Fonden.

On Wednesday, Chavez announced the creation of a $1 billion fund to finance joint public-private projects in strategic sectors such as food, agriculture and manufacturing

**(See Venezuela, page 2)**

# Senior Shell Official Visits Baghdad to Discuss Natural Gas Deal

A top-ranking Royal Dutch Shell official is in Baghdad this week to discuss an agreement to establish a joint venture to invest in Iraq's gas sector and process associated gas from southern fields for domestic and export markets, an Iraqi oil source told Oil Daily Thursday.

The talks, the first held in the Iraqi capital by a senior international oil company executive since 2003, come as Oil Minister Hussein al-Shahristani prepares to announce Iraq's first postwar upstream bid round, now scheduled for Jun. 30, at ministry headquarters. The event may coincide with the signing of technical support agreements with five majors to boost production. These signings are also planned for the end of the month, with Baghdad Airport a possible venue.

Mounir Bouaziz, Shell's gas and power vice president for new business development for the Middle East, North Africa and the Levant, met with oil ministry officials on Wednesday and Thursday in a bid to conclude an initial gas agreement this month, the source said. Last week, a ministry source told Oil Daily that the talks, the second round since late May, were expected to be held in Damascus.

Bouaziz's four-day visit to Baghdad was the first by a top Shell executive since the US invasion and signals a certain confidence by the Anglo-Dutch supermajor in doing business with Iraq.

Shell's proposed South Gas Utilization project aims to gather 600 million cubic feet per day of gas now flared from most of the southern oil fields, develop infrastructure for future associated gas production, and market the gas — as well as associated liquefied petroleum gas and condensate — inside Iraq and abroad.

The two sides are discussing a joint venture between Shell and South Gas Co. (SGC) under which the latter would have a controlling stake of 51%, with Shell on 49%. SGC's capital participation would be in the form of assets, while Shell would contribute cash equivalent to SGC's holdings. The geographical territory would be defined as the provinces of Thiqar, Missan and Basrah.

Initial investment is estimated at $5 billion over the first five years to capture about 1 billion cubic feet per day of raw gas and build LNG facilities with a capacity to produce 400 MMcf/d (2.5 million tons per year) of LNG.

The two sides still need to agree the terms under which the joint venture would purchase raw gas from the state and sell treated gas for the domestic market, including for power generation and local industries.

Ministry sources said that according to plans now being discussed, al-Shahristani will officially launch the licensing round at the end of the month and detail the bid process and the oil and gas fields to be tendered.

**Ruba Husari, Dubai**

## Venezuela . . .

**(Continued from 1)**

as well as increases in subsidies and a debt relief package for agricultural producers.

The president invited the private sector to invest in Venezuela, offering tax breaks and looser foreign exchange controls as incentives.

Caracas is seeking to reverse a spectacular drop in direct investment. According to the Central Bank, Venezuela had net investment outflow of $1.7 billion during the first three months of 2008.

Thanks to oil exports, which constitute 90% of Venezuela's revenues, the country had a positive current account balance of $10 billion during first quarter of 2008.

However, Venezuela's overall balance of payments, which records imports and exports and movements of capital, showed a negative balance for the quarter of $3.8 billion due to capital flight.

There is much skepticism about the private sector response to Chavez's call for new investment commitments, mainly due to his interventionist style of managing the national economy.

The government has taken control of cement, electricity and telecommunications companies and has confiscated private lands. Earlier this year it ordered the nationalization of steel company Sidor, which is owned by the Argentine-Italian conglomerate Techint.

In the oil and gas sector, PDV took control of four multibillion-dollar projects in the Orinoco heavy oil belt from six western oil companies: Total, Statoil, BP, Chevron, Exxon Mobil and ConocoPhillips (OD May 2,p1).

The takeover of the Orinoco projects came after the government unilaterally turned 32 service contracts with private companies into joint venture companies controlled by PDV.

"If you were an investor, would you risk bringing in your capital to Venezuela? ... No," said economist Ana Maria Di Leo of Caracas-based economic think tank Veneconomia.

A lack of new investment, capital flight and price controls has resulted in increased imports of goods. Economists estimate that the government spent some $4.3 billion on imports of consumer goods last year.

In spite of a deteriorating economy, historically high oil prices will allow Venezuela to increase government spending and no budgetary adjustments are expected until later this year.

The government "has plenty of leeway to delay any adjustments until after November's key regional and local elections," Eurasia Group Latin America analyst Patrick Esteruelas said in a report published on Thursday.

Venezuelans will go to the polls in November to pick new governors and mayors. That poll is seen as a key test of popular support for Chavez, who lost a constitutional referendum last December that would have allowed him to stay in office for life.

Venezuela produces around 2.4 million barrels of oil per day, according to the International Energy Agency. However, the Chavez government maintains that it produces 3.1 million b/d.

**Patricia I. Vasquez, Washington**

## Congress . . .

**(Continued from 1)**

and announced the formation of an interagency taskforce to monitor trading in the commodity markets.

Senate Majority Whip Byron Dorgan (D-N.D.) plans to hold a joint hearing next week of the Senate Finance Committee and the Senate Agriculture Committee on strengthening federal oversight of the oil futures market.

"It's time to open the books on the oil futures market," Durbin said Wednesday in a prepared statement. "The agency in charge of regulating oil markets is currently blocked from accessing critical information on trades made on foreign exchanges or on over-the-counter trades. We can't expect the CFTC to monitor the market and keep gas prices stable if they don't have the information they need."

Democrats in the House are also eyeing action against market speculators.

Rep. John Dingell, chairman of the House Energy and Commerce Committee, introduced legislation Wednesday looking into the role of speculators in the energy markets.

"For too long energy markets have operated behind a veil of secrecy," Dingell said in a prepared statement.

The bill, cosponsored by Rep. Joe Barton (R-Texas), would require the Department of Energy to set up a working group of federal regulatory agencies to identify the factors impacting the price of oil. The group would be tasked with producing a report for Congress on gaps in regulatory oversight of the market.

**Robert Dillon, Washington**

# Crude Futures Reverse Early Losses to Close With Slight Gain

After suffering an initial setback, crude futures edged their way back into the black to close with slight gains on Thursday. Prices had fallen in early trading as the US dollar staged a rally on the back of better-than-expected retail sales data.

Nymex light, sweet crude closed 36¢ higher at $136.74 per barrel. Brent on ICE Futures Europe gained $1.07 to end the day at $136.09/bbl.

"We're in a consolidation mode between $131 and $139," said Tom Bentz of BNP Paribas. "We could spend a couple of more days chopping around that range, before puncturing $140 next week."

The US currency and the price of oil have had a fairly close inverse relationship over the last year. On Wednesday, oil prices rose on news of a big crude draw on crude stocks, but also because the dollar stumbled after a two-day rally.

Crude had previously fallen more than $7 during the dollar's two-day rally which was triggered by comments from US officials that suggested a vigilant stance against inflation.

Some traders are rethinking Wednesday's news of a drawdown in US crude stocks and have dismissed the idea that it could imply tight global supplies.

"The simple fact is that at these price levels it's becomes increasingly more expensive to hold inventory, except at the lowest possible level," said Nauman Barakat of Macquarie Futures. "With credit getting tighter ... [and] crude prices going ever higher, imports will continue to be low with 'just in time inventory' now being vital to the survival of the business."

**Ramsey al-Rikabi, New York**

## Daily Oil & Gas Price Review

*Prices for Thursday, June 12, 2008*

### Crude Oil — Nymex Light Sweet ($/barrel)




**Light Sweet Futures — Prompt Month ($/barrel)**

| | Change | 1st Month | 5-Day Avg. | 2nd Month | 3rd Month |
|---|---|---|---|---|---|
| Nymex Light Sweet | +0.36 | 136.74 | 135.46 | 137.38 | 137.68 |
| ICE Brent | +1.07 | 136.09 | 134.75 | 137.25 | 137.95 |

| Cash/Spot | Change | Spot Price | 5-Day Avg. | Month-Ago | Year-Ago |
|---|---|---|---|---|---|
| WTI (Cushing) | +0.48 | 136.88 | 135.50 | 124.18 | 65.06 |
| WTI (Midland) | -0.01 | 136.93 | 135.67 | 123.75 | 64.73 |
| Brent (Dated) | -2.41 | 131.75 | 133.46 | 120.82 | 69.29 |

**US Domestic Crudes ($/barrel)**

| Cash/Spot | Change | Spot Price | 5-Day Avg. | Month-Ago |
|---|---|---|---|---|
| WTS (Midland) | -0.01 | 133.38 | 132.01 | 118.65 |
| LLS (St. James) | -0.01 | 141.08 | 139.75 | 127.05 |
| ANS (California) | +0.55 | 136.84 | 135.55 | 123.78 |
| Kern River (SJV) | +5.00 | 120.40 | 114.73 | 111.49 |
| Line 63 (SJV) | +0.55 | 136.34 | 135.45 | 124.28 |

**International Crudes ($/barrel)**

| Cash/Spot | Change | Spot Price | 5-Day Avg. | Month-Ago |
|---|---|---|---|---|
| Opec Crude Basket[I] | 0.22[I] | 128.87 | 128.76 | 118.76[G] |
| Nigeria Bonny Light | -2.41 | 136.75 | 136.77 | 125.17 |
| Dubai | +1.58 | 131.93 | 129.07 | 116.79 |
| Oman | +1.41 | 129.21 | 128.87 | 118.11 |
| Russia Urals | -2.31 | 126.65 | 128.51 | 115.82 |

### Refined Products — Nymex Gasoline (¢/gallon)




**Heating Oil/Gasoline Futures — Prompt Month (¢/gallon)**

| Futures | Change | 1st Month | 5-Day Avg. | 2nd Month | 3rd Month |
|---|---|---|---|---|---|
| **Nymex (¢/gal.)** | | | | | |
| RBOB Gasoline | +6.02 | 352.60 | 345.06 | 351.25 | 349.15 |
| Heating Oil | -3.21 | 394.27 | 391.62 | 396.67 | 399.72 |
| **ICE (London)** | | | | | |
| Gasoil ($/ton) | 0.00 | 1257.75 | 1257.00 | 1242.25 | 1246.00 |
| Gasoil (¢/gal.) | 0.00 | 399.29 | 399.05 | 394.37 | 395.56 |

**US Product Spot Markets[H]**

| | Gulf Coast | | | | New York | | | | Los Angeles | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Gasoline (¢/gal.)** | Change | Spot Price | 5-Day Avg. | Month-Ago | Change | Spot Price | 5-Day Avg. | Month-Ago | Change | Spot Price | 5-Day Avg. | Month-Ago |
| Regular Gasoline | +2.85 | 334.92 | 329.78 | 308.00 | +4.10 | 341.17 | 333.33 | 305.60 | -0.25 | 370.75 | 370.00 | 312.24 |
| Premium Gasoline | +3.35 | 341.17 | 332.08 | 320.00 | +6.60 | 359.17 | 350.13 | 323.90 | -1.25 | 385.75 | 384.40 | 323.24 |
| Regular RBOB | +3.93 | 352.75 | 348.40 | 328.84 | +4.10 | 353.92 | 347.63 | 320.10 | -1.25 | 378.75 | 376.42 | 317.24 |
| **Mid-Distillates (¢/gal.)** | | | | | | | | | | | | |
| No. 2 Heating Oil | -4.87 | 389.11 | 388.35 | 358.10 | -4.87 | 391.86 | 390.05 | 361.85 | — | — | — | — |
| No. 2 Low Sulfur Diesel | -5.62 | 393.36 | 392.30 | 368.10 | -4.37 | 397.11 | 396.20 | 376.35 | -3.08 | 386.85 | 392.53 | 377.85 |
| Jet Fuel | -4.87 | 399.36 | 396.35 | 372.85 | -3.37 | 402.61 | 399.55 | 377.60 | -7.08 | 407.85 | 409.43 | 385.35 |
| **Residual Fuel ($/bbl)** | | | | | | | | | | | | |
| No. 6 Oil (low sulfur) | +0.38 | 108.63[A] | 105.86 | 91.38 | +0.81 | 120.78[B] | 119.13 | 95.13 | — | — | — | — |
| No. 6 Oil 1% S | +0.38 | 108.13[C] | 105.36 | 89.88 | +0.31 | 106.78[D] | 105.43 | 87.53 | — | — | — | — |
| No. 6 Oil 3% S | +0.97 | 96.72 | 93.82 | 81.78 | +0.41 | 96.38 | 94.65 | 83.53 | +5.00 | 697.50[E] | 680.00 | 580.00 |

### Natural Gas — Nymex Henry Hub ($/MMBtu)




**Nymex Henry Hub — Prompt Month ($/million Btu)**

| Futures | Change | 1st Month | 5-Day Avg. | 2nd Month |
|---|---|---|---|---|
| **Nymex ($/MMBtu)** | | | | |
| Henry Hub | +0.138 | 12.798 | 12.638 | 12.895 |

**Spot Gas Prices ($/MMBtu)[F]**

| Key Hubs/Cities | Change | Spot Price | Week-Ago | Month-Ago |
|---|---|---|---|---|
| New York | -0.11 | 13.39 | 13.46 | 12.33 |
| Henry, Louisiana | -0.02 | 12.51 | 12.53 | 11.52 |
| Chicago | -0.03 | 12.42 | 12.39 | 11.60 |
| Katy, Texas | -0.00 | 12.27 | 12.27 | 11.19 |
| Southern California Border | -0.00 | 11.42 | 10.41 | 10.78 |
| AECO Hub (Canada) | 0.22 | 11.21 | 10.81 | 10.29 |

Produced by Oil Daily in cooperation with Reuters. All spot assessments are bid prices published by Reuters at 5.30 p.m. ET.

Notes:
A—0.7% sulfur low pour.
B—0.3% sulfur high pour.
C—Low pour.
D—High pour.
E—Price is for 380 CST, given in $/metric ton.
F—Source: *Natural Gas Week*
G—20-day avg.
H—Bid prices for latest spot deals at press time.
I—Opec basket price is for previous day.

# Alaska Rejects Exxon Mobil's Bid to Retain Point Thomson Field

The state of Alaska has rejected Exxon Mobil's bid to retain control of the Point Thomson oil and gas field.

The ruling by state Natural Resources Commissioner Tom Irwin on Wednesday reaffirms his Apr. 22 decision to terminate the Point Thomson unit and return the land to state control (OD Apr.23,p4).

"This unit is terminated because the Point Thomson unit working interest owners failed to fulfill the commitments made in the unit agreement," Irwin wrote in the 25-page decision.

Exxon and its partners failed to offer a viable plan to develop the 106,200-acre North Slope field, Irwin said.

Exxon had proposed spending $1.3 billion over the next six years to drill five wells, with production of 10,000 barrels a day of gas condensate to begin in 2014.

Irwin turned down the plan — the 23rd Exxon has proposed over the years — saying he didn't believe the company would deliver on its promises. In his decision, Irwin said he considered the oil major's history of broken promises to develop the unit.

"In the more than 30 years since the Point Thomson unit, or PTU, was formed, no oil or gas has been brought to market and none of the infrastructure necessary for development has been built," Irwin stated.

Exxon spokeswoman Margaret Ross said the company was disappointed with the decision and would appeal.

Exxon and the other leaseholders have spent $800 million on the unit to date, and have a comprehensive technical understanding of its reservoirs, Ross said.

"Despite the DNR's decision, we are continuing plans to begin drilling this coming winter," she said. "We have the right to conduct such drilling under the terms of the leases, which have not yet expired."

Director of the state Division of Oil and Gas Kevin Banks said giving Exxon the benefit of the doubt would have jeopardized the state's efforts to get a massive North Slope natural gas pipeline project underway.

The decision brings the state one step closer to being able to offer the gas-rich area, located 60 miles east of Prudhoe Bay, to companies that the state believes will be more willing to develop the resource.

Point Thomson is estimated to hold about a quarter of the North Slope's 35 trillion cubic feet of natural gas reserves and is considered a cornerstone of any future gas pipeline project.

The field, located between Prudhoe Bay and the Arctic National Wildlife Refuge, is also believed to contain between 580 million and 950 million barrels of oil. There is some dispute over whether the field's oil resources should be produced before tapping its gas, in order to maximize production.

The state has been wrestling with Exxon over Point Thomson for years — at least four governors have contemplated evicting the Irving, Texas-based company and its partners for failing to develop the field.

In late 2006, the state finally signaled it had lost patience with Exxon, and began the process of taking back the unit after years of approving nearly two dozen development plans that were never fulfilled.

The unit was terminated in late 2006, a decision later upheld by the state Superior Court. However, Judge Sharon Gleason remanded the decision to the department to give Exxon and its partners an opportunity to suggest an alternative remedy for their failure to develop.

Nan Thompson, unit manager for the Division of Oil and Gas, said the companies failed to offer a workable solution but Ross said Exxon does not agree.

"The owners provided significant assurances that they would meet their commitments, including a provision for unit termination if we did not meet key milestones included in the plan of development," Ross said.

Judge Gleason is set to review the decision Jun. 15. If she agrees with Irwin, Exxon could appeal to the state Supreme Court. Gleason's decision is expected some time in the fall.

State officials estimate it could take two years for the case to work its way through the legal system.

Exxon, which first discovered gas at Point Thomson in 1977, holds a 36% stake in the unit.

Other owners include BP (32%), Chevron (25%) and ConocoPhillips (5%).

**Robert Dillon, Washington**

# Chevron to Collaborate on Pipelines With Russia's Transneft

In a potentially significant breakthrough for oil exports from Russia and Kazakhstan, Chevron and Russian national pipeline operator Transneft have signed an agreement that opens the way for collaboration on pipeline projects.

The document, a copy of which has been obtained by Oil Daily, says the "parties have agreed to review opportunities of joint participation in projects related to design, engineering, construction and operation of pipeline facilities in the Russian Federation and in third countries."

The agreement, signed last weekend, adds that, "For the purpose of securing a stable supply of crude oil and refined products to the international markets, the parties shall make joint efforts to explore the possibility of collaboration on international pipeline projects, including the establishment of joint ventures and businesses."

Chevron and Transneft are already partners in the Caspian Pipeline Consortium (CPC), which pumps crude from Kazakhstan through Russian territory to an export terminal near the Black Sea port of Novorossiysk. Transneft was entrusted last year with managing Russia's 24% stake in CPC, whose members have failed to agree on expanding the line's capacity, although there are new signs of progress.

Chevron and Transneft have in the past also expressed their intention to cooperate on the construction of the Bourgas-Alexandroupolis pipeline bypassing the Bosporus Strait, with the aim of sending 340,000 barrels per day of Kazakh crude from the CPC.

The state keeps a tight grip on the ownership and operation of Russia's pipelines, and it is doubtful that the US company would be allowed access in these areas, although some joint design and engineering projects are possible.

The two companies signed a document of intent in May 1999 that seems to have had a limited impact. But one of Russia's key priorities is a massive expansion of the country's infrastructure that would require huge spending and could open the door further to private investors.

Chevron's philosophy on pipelines is that if its own crude is involved, it would much rather be an owner of the route than just a shipper.

The deal signed over the weekend also says the two sides "have agreed to further pursue and develop cross-training of the two companies' employees at Chevron and Transneft enterprises."

The document was signed after Kazakhstan announced at the end of last week that it had "started construction" of a $1.5 billion pipeline as part of a scheme to ship crude oil from the Tengiz and Kashagan fields to Azerbaijan for export to world markets via the BP-operated Baku-Tbilisi-Ceyhan pipeline.

The route would reduce Kazakhstan's dependence on Russia. According to the Kazakhs, Chevron will be a "co-investor" in the 750 kilometer pipeline, which would initially carry 460,000 b/d.

**Nelli Sharushkina, Moscow**

# Italy's Eni Agrees to Tougher Contract Terms to Work in Libya

Italy's Eni said Thursday that it has signed six exploration and production sharing contracts with Libya's National Oil Corp. (NOC), converting its original deals to the new Epsa-4 terms.

The two sides had set out the basic outline for converting the contracts in a $28 billion strategic agreement reached in October (OD May9,p5). The contracts have been renewed for 25 years to 2042 for oil production and 2047 for gas.

Under the new deals, Eni said it will seek to boost oil recovery at existing fields through carbon dioxide, water and gas injection programs, and undertake a new drilling campaign.

It will also carry out work "aimed at supplying the local [gas] market and strengthening the hub of Mellitah with the upgrading of the gas export capacity."

The Italian energy giant said in October that it intended to double its gas export capacity in Libya to 16 billion cubic meters per year by expanding exports through the Greenstream pipe to Italy by 3 Bcm/yr and building a 5 Bcm/yr LNG export plant.

Right now, Eni exports 8 Bcm/yr, with NOC, through Greenstream. Its average operated production in Libya is in excess of 550,000 barrels of oil equivalent per day, of which Eni's share is about 250,000 boe/d.

NOC is undertaking contract renegotiations with all companies currently producing under non-Epsa-4 contracts. Final deals are expected to be signed soon by Petro-Canada, and by a pairing of US Occidental and Austrian OMV — all of which, like Eni, inked initial deals last year.

NOC is still negotiating similar agreements with other key producers such as Spain's Repsol YPF and France's Total.

In line with tight production splits bid in each of NOC's Epsa-4 licensing rounds, firms renegotiating older contracts have seen their production shares fall. They have also paid out large signature bonuses to NOC in exchange for securing contract extensions and the state firm's approval of development plans to raise output.

Older Epsa agreements gave foreign partners production shares ranging from about 15% to 40%. By contrast, Eni's new contracts see its share of oil output fall to about 12%, although the split for gas is higher.

New production promised under the contracts renegotiated so far — Eni's doubling of gas export capacity, the extra 200,000 b/d pledged by Oxy and OMV, and the 100,000 b/d from Petro-Canada — will help Tripoli advance toward its ambitious goal of producing 3 million b/d by 2012, up from 1.8 million b/d now.

But the increase also assumes that NOC will manage to channel oil revenue windfalls into meeting its share of upstream investment under the new deals. The Libyan state firm has so far promised to invest $20 billion under the contracts renegotiated with Eni, Oxy and Petro-Canada.

Growth from the US Oasis group — a consortium of ConocoPhillips, Marathon and Hess — at the Waha concession also forms a key plank of the growth strategy. But Waha output has remains stalled at about 350,000 b/d since the partners' reentry into Libya in 2005, far below the targeted ramp-up to some 600,000 b/d.

Complicating factors include tense relations between the US and Libya — although these may ease if comprehensive compensation talks that kicked off in late May make headway — plus uncertainties about the consortium's contractual status.

NOC has indicated that any non-Epsa-4 contract is subject to renegotiation, and Marathon earlier this year said it had been approached informally by NOC about moving to Epsa-4 terms. But the companies argue that fiscal terms under the 25-year contract they negotiated in 2005 are already tough, giving them a shared return of just 6.5% after tax and royalties.

**Jill Junnola, London**

# Oil Majors File Arbitration Claims Against Ecuador and Bolivia

Two major international oil companies said this week they are seeking international arbitration against leftist Latin American governments that took steps toward nationalizing their oil and gas industries.

Spain's Repsol YPF is taking Ecuador to court after President Rafael Correa's government hiked the country's tax on windfall oil profits, company spokesman Federico Cruz said on Thursday.

Separately, Dow Jones reported that Royal Dutch Shell and Ashmore Energy International filed an arbitration request against the Bolivian government following the nationalization of gas pipeline company Transredes. Shell and Ashmore jointly owned a 51% stake in the company.

Soaring oil prices have emboldened leftist leaders in Latin America to carry through resource nationalism policies and redefine contract terms. This, in turn, has fueled a proliferation of arbitration cases in the region.

Repsol filed its case against Ecuador at the World Bank's International Center for Settlement of Investment Disputes (ICSID). Correa has criticized the ICSID on the grounds that it undermines the country's sovereignty.

The dispute is over the government's introduction last year of a 99% windfall tax on profits earned above a set benchmark price.

Repsol and other private oil producers claim that since the tax was implemented they have been losing money by continuing oil operations in Ecuador.

"We have to protect the interest of our partners and shareholders," Cruz told Reuters in Quito. "We hope to reach an agreement [with Ecuador] and immediately remove the charges," he added.

Indeed, arbitration is often used primarily as a bargaining tool to restart negotiations, and disputes taken to arbitration rarely reach a final ruling. Moreover, a tribunal's ability to enforce rulings is often limited.

Several Latin American countries have vowed to abandon the ICSID, claiming it favors private companies over government interests (OD May13,p5).

Bolivia pulled out of the ICSID in 2007, while Ecuador said it would not submit future hydrocarbon and mining claims to the tribunal.

Bolivia's new Minister for the Defense of Nationalization Hector Arce said that a holding company for Shell and Ashmore had filed the arbitration claim against his country, but he did not name the arbitration body handling the case.

Bolivian President Evo Morales nationalized Transredes on Jun. 2 after negotiations for a state takeover of the company broke down (OD Jun.3,p7).

Latin America has accounted for a majority of arbitration claims in recent international energy investment disputes, with 56% of all claims originating in the region since 2000, according to Christopher Goncalves, Director of International Energy at Navigant Consulting.

Venezuela is currently involved in proceedings at the ICSID with Exxon Mobil and ConocoPhillips, which requested arbitration in response to the expropriation of their assets in the Orinoco Belt heavy oil region last year.

In addition to Repsol's arbitration request, Ecuador currently faces two more arbitration cases at the ICSID filed by Occidental Petroleum and Panama-based City Oriente.

**Lisa Viscidi, New York**



# NEWS ALERT

From staff and wire reports

## Alternatives

### Suncor Expands Ethanol Plant

Suncor Energy is planning a C$120 million (US$118 million) expansion of its St. Clair ethanol plant in Sarnia, Ontario, boosting production of the biofuel to meet new blending requirements in the province of Ontario.

The company said the expansion will double the capacity of the plant to 400 million liters per year.

Suncor will use the ethanol to blend with gasoline sold through its chain of Sunoco-branded stations in Ontario and will also market it to other gasoline distributors.

Ontario is raising its requirement for ethanol content in gasoline to 10% from 5% in 2010.

The St. Clair plant is already Canada's biggest ethanol producer. Construction at the site will begin immediately and the company said it expects to complete the work late next year.

## International

### Total Slammed Over Subsidy

French politicians have criticized a government deal struck with Total under which the French major will give €105 million ($163 million) this year to a domestic heating fuel subsidy scheme, saying the contribution is insufficient.

"They could make a much bigger effort," former socialist minister Pierre Moscovici told a French newspaper, indicating Total could afford to pay €1 billion. "It is a good start but we can continue these discussions. I am sure they will lead to even better results," a spokesman for the conservative UMP Party told newswires.

Total provided the same amount for the subsidy program last year and decided on Jun. 9 to renew the contribution this year. The program subsidizes low-income households.

A Total spokesman declined to comment, pointing out that nothing definite has been decided.

## EIA Gas Storage Report

### Gas in Storage Rises by 80 Bcf

Stocks of working natural gas in US storage facilities rose by 80 Bcf in the week ending Jun. 6, leaving storage levels at 1,886 Bcf, according to the Energy Information Administration. Gas in storage is 343 Bcf lower than at the same time last year.

### Working Gas in Storage

*(in Bcf for week ended Jun. 6)*

| Region | Jun. 6 | May 30 | 2007 |
|---|---|---|---|
| E. Consuming | 959 | 905 | 1,080 |
| W. Consuming | 267 | 251 | 339 |
| Producing | 660 | 650 | 810 |
| **Total** | **1,886** | **1,806** | **2,229** |

*Source: Energy Information Administration*

## Oil & Gas Markets

### Saudi Hike Benign for US

Saudi Aramco's July term differentials effectively increased prices to the US, lowered those to Europe and followed a by now familiar pattern in Asia with cuts for heavier grades and increases for lighter crudes.

Despite the higher US prices, Aramco's terms for the US looked benign as prices for competing grades have risen more.

European refiners complained that the Saudi prices came in too high. Aramco's pricing for its key market, Asia, was in line with most expectations.

Saudi crudes are priced against WTI in the US, B-Wave in Europe and Oman/Dubai in Asia.

## Saudi Crude Price Differentials

### July barrels on an f.o.b. basis

*($/bbl)*

| Basis | US WTI | Europe Brent | Asia Dubai |
|---|---|---|---|
| **Extra Light** | | | |
| July | 2.40 | -0.50 | 6.10 |
| June | -1.45 | 0.00 | 5.85 |
| **Arab Light** | | | |
| July | -2.45 | -5.75 | 2.05 |
| June | -5.65 | -4.85 | 1.85 |
| **Arab Medium** | | | |
| July | -8.30 | -10.00 | -3.70 |
| June | -10.45 | -8.50 | -3.35 |
| **Arab Heavy** | | | |
| July | -13.30 | -13.05 | -7.95 |
| June | -14.90 | -11.15 | -7.45 |

## Stock Market Scorecard

| Integrated Majors | Close 6/12 | 1-Day Chg. | % Chg. | % Chg. 10-Day | % Chg. 52-Wk | % Chg. YTD |
|---|---|---|---|---|---|---|
| Repsol YPF | 41.31 | +0.64 | +1.57% | -1.38% | +14.75% | +15.94% |
| Marathon | 51.19 | +0.22 | +0.43 | +0.04 | -18.04 | -15.89 |
| Statoil | 37.73 | -0.02 | -0.05 | -3.68 | +35.91 | +23.62 |
| BP | 69.13 | -0.75 | -1.07 | -4.92 | +2.89 | -5.52 |
| Chevron | 98.06 | -1.36 | -1.37 | -2.35 | +20.53 | +5.07 |
| Petro-Canada | 56.63 | -0.80 | -1.39 | -3.94 | +11.41 | +5.61 |
| ConocoPhillips | 92.49 | -1.59 | -1.69 | -0.08 | +18.77 | +4.75 |
| Hess | 123.65 | -2.13 | -1.69 | -0.79 | +109.90 | +22.60 |
| Exxon Mobil | 87.06 | -1.55 | -1.75 | -3.73 | +4.82 | -7.08 |
| Eni | 75.39 | -1.83 | -2.37 | -7.96 | +7.32 | +4.09 |
| Shell-A | 80.67 | -2.03 | -2.45 | -6.57 | +5.98 | -4.19 |
| Shell-B | 79.10 | -2.05 | -2.53 | -6.83 | +1.10 | -4.70 |
| Total | 81.23 | -2.32 | -2.78 | -7.46 | +9.37 | -1.66 |
| **IPF Index** | **473.09** | **-7.79** | **-1.62** | **-2.59** | **+13.06** | **+0.89** |
| **Large Producers** | | | | | | |
| Pioneer | 75.88 | +0.23 | +0.30 | +6.87 | +48.38 | +55.36 |
| EOG Resources | 128.58 | +0.19 | +0.15 | -4.34 | +69.94 | +44.07 |
| Anadarko | 77.66 | -0.03 | -0.04 | +0.83 | +54.58 | +18.22 |
| Devon Energy | 115.96 | -0.65 | -0.56 | -2.73 | +47.31 | +30.42 |
| Canadian Natural | 101.79 | -1.25 | -1.21 | +1.90 | +54.56 | +39.17 |
| Nexen | 40.17 | -0.52 | -1.28 | +1.98 | +32.40 | +24.48 |
| Apache | 137.94 | -2.06 | -1.47 | -0.74 | +65.22 | +28.27 |
| XTO Energy | 68.52 | -1.25 | -1.79 | +7.52 | +41.10 | +33.41 |
| Talisman | 23.66 | -0.44 | -1.83 | 0.00 | +17.71 | +27.75 |
| EnCana | 89.64 | -1.70 | -1.86 | -2.23 | +42.51 | +31.90 |
| Chesapeake | 58.29 | -1.38 | -2.31 | +8.18 | +64.66 | +48.70 |
| Occidental | 88.82 | -3.20 | -3.48 | -4.62 | +55.82 | +15.37 |
| Murphy Oil | 89.63 | -3.48 | -3.74 | -5.93 | +51.94 | +5.65 |
| **Refiners** | | | | | | |
| Frontier Oil | 27.10 | +0.79 | +3.00 | -10.53 | -32.22 | -33.22 |
| Alon | 14.09 | +0.29 | +2.10 | -7.30 | -65.41 | -48.16 |
| Sunoco | 40.14 | -0.04 | -0.10 | -11.88 | -50.24 | -44.59 |
| Valero | 44.42 | -0.26 | -0.58 | -10.37 | -39.83 | -36.57 |
| Holly | 40.44 | -0.34 | -0.83 | -3.85 | -41.40 | -20.53 |
| Tesoro | 22.06 | -0.43 | -1.91 | -8.99 | -62.42 | -53.75 |
| **Integrated Energy** | | | | | | |
| Sempra | 55.96 | +0.04 | +0.07 | -3.88 | -5.62 | -9.57 |
| TransCanada | 37.94 | -0.31 | -0.81 | -5.08 | +8.96 | -7.31 |
| Duke Energy | 17.78 | -0.16 | -0.89 | -3.37 | -4.31 | -11.85 |
| Oneok | 49.43 | -0.52 | -1.04 | -1.63 | -1.28 | +10.41 |
| Enbridge | 43.15 | -0.70 | -1.60 | -3.90 | +26.72 | +6.73 |
| El Paso | 20.95 | -0.48 | -2.24 | +5.97 | +24.41 | +21.52 |
| Williams | 38.23 | -0.94 | -2.40 | -0.47 | +25.55 | +6.85 |
| **Service Companies** | | | | | | |
| Transocean | 144.48 | -1.03 | -0.71 | -8.45 | +37.67 | +0.93 |
| Nabors | 44.48 | -0.32 | -0.71 | +6.11 | +28.55 | +62.40 |
| Baker Hughes | 86.29 | -0.89 | -1.02 | -3.40 | +2.75 | +6.40 |
| Halliburton | 48.36 | -1.01 | -2.05 | -1.10 | +37.15 | +27.57 |
| Schlumberger | 98.82 | -2.48 | -2.45 | -3.96 | +23.25 | +0.46 |
| Patterson-UTI | 33.01 | -0.92 | -2.71 | +3.32 | +25.23 | +69.11 |
| Ensco | 75.84 | -3.76 | -4.72 | +3.90 | +25.44 | +27.21 |

Note: Ranked by daily percentage change.

## Oil Field Service

### Grey Wolf Rejects Bid

Contract driller Grey Wolf has rejected Precision Drilling Trust's $1.6 billion unsolicited bid, opting to go forward with its acquisition of Basic Energy Services instead.

Grey Wolf said its board concluded that the Precision Drilling bid would not be better for the company than its deal with Basic. It said the merger agreement between Grey Wolf and Basic is still in effect.

Canada's Precision Drilling announced its bid on Tuesday, saying Grey Wolf's assets would help it build its business in the US (OD Jun.11,p8).

But Grey Wolf had already agreed to buy Basic Energy Services in April, in a deal that would merge the two companies into a new entity still called Grey Wolf and majority-owned by Grey Wolf's shareholders.

### Halliburton Buys WellDynamics

Halliburton said on Wednesday that it signed a deal to acquire the remaining 49% interest in WellDynamics BV from Shell Technology Ventures Fund, giving it 100% ownership of the company. Terms of the deal were not disclosed.

Oilfield services companies like Halliburton have been acquiring smaller rivals in a bid to beef up technology offerings amid record crude oil prices and high natural gas prices.

WellDynamics — which provides services to help increase the productivity of reservoirs — has 510 employees and is headquartered in the Netherlands.

## Personnel

### Marathon Names Renewables VP

Marathon Oil has named Linda Capuano as the company's vice president of emerging technology.

Marathon's newly created emerging technology group will focus on renewable and alternative fuels, energy efficiency, carbon intensity, and carbon capture and sequestration. The group will search for new investment opportunities in the emerging business.

Capuano was most recently a senior vice president at Solectron Corp. in California. Prior to that, she was executive vice president and chief technology officer of Advanced Energy in Fort Collins, Colorado, a manufacturer of equipment for semiconductor and solar applications.

## KNOC Gets Big Cash Injection from Seoul

The South Korean government is injecting 19 trillion won ($18.4 billion) into Korea National Oil Corp. (KNOC) to give the state firm more financial muscle in competing for oil assets and projects overseas, with the goal of boosting production sixfold over the next four years.

A beefed-up KNOC would focus on buying producing assets, the Ministry of Knowledge Economy (MKE) said. "Until now, KNOC has been mostly buying fields under exploration. But from now on, it will focus on buying producing fields as well as acquiring other countries' oil development projects," a MKE official said.

There may be risks involved in mergers and acquisitions when oil prices are rising rapidly, but prices of producing fields have been relatively stable because they are based on the long-term oil price outlook, he added.

Of the $18.4 billion, $4 billion would come from state funds. Of this, $933 million would be handed over this year and the rest in annual payouts between 2009 and 2012. The much larger slice of $14.4 billion would come out of KNOC's own funds and borrowings. The National Pension Service is expected to contribute too.

An additional $579 million government injection, would raise KNOC's development budget this year from $352 million to $931 million.

KNOC now has a target of producing 300,000 barrels per day of oil by the end of 2012, up from 50,000 b/d at the end of 2007, and its workforce would be expanded to 2,500 from 450. As a result of the changes, the aim is to have Korea meet 25% of domestic oil and gas demand from its own resources by 2012, up from an original goal of 18%.

The government says it will consider listing KNOC once its production capacity has increased after 2012.

Seoul has also decided not to merge KNOC with Korea Gas (Kogas) following a review of plans to combine the two companies to boost their buying power. The MKE said KNOC will instead seek a strategic alliance with Kogas to work together on oil and gas projects.

**Staff and wire reports**



**OIL DAILY**

*Founded 1951* • www.energyintel.com • Washington Editorial Tel.: (202) 662-0700 • Fax: (202) 783-8230. New York Tel.: (212) 532-1112. Houston Tel.: (713) 222-9700

*Published By:* Energy Intelligence

Raja W. Sidawi, *Chairman*
Thomas E. Wallin, *President*
Paul Merolli, *Editor, Oil Daily*
pmerolli@energyintel.com
Jane Collin, *Editor, International Edition*

**Editorial:** Sarah Miller *Editor-at-Large*. **Washington:** Greg Couturier, R.A. Dillon, Matt Piotrowski, Patricia Vasquez. **Houston:** Jeff Gosmano, Andrew Kelly, Alan Lammey, Barbara Shook, Rachael Seeley, John Sullivan. **New York:** David Knapp, Ramsey al-Rikabi, John van Schaik, Lisa Viscidi. **London:** James Batty, Deborah Kelly, Kerry Preston. **Singapore:** Song Yen Ling, Clara Tan. **Moscow:** Nelli Sharushkina, Carter Tellinghausen. **Dubai:** Ruba Husari, Alex Schindelar. **Production:** Terry King, *Production Manager* Agnes Lukasiak, *Production Coordinator*

Copyright © 2008 by Energy Intelligence Group, Inc. ("EIG") ISSN 1529-4366. Oil Daily ® is a registered trademark of EIG. All rights reserved. Access, distribution and reproduction are subject to the terms and conditions of the subscription agreement and/or license with EIG. Access, distribution, reproduction or electronic forwarding not specifically defined and authorized in a valid subscription agreement or license with EIG is willful copyright infringement. Additional copies of individual articles may be obtained using the pay-per-article feature offered at www.energyintel.com.

# EXHIBIT B

# Certificate of Registration




This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

Marybeth Peters

Register of Copyrights, United States of America




TX 6-648-007

EFFECTIVE DATE OF REGISTRATION (Assigned by Copyright Office)

Month 7 Day 21 Year 08

APPLICATION RECEIVED 7-21-08

ONE DEPOSIT RECEIVED 7-21-08

EXAMINED BY AWD

CORRESPONDENCE ☐

FEE RECEIVED JUL 21 2008

DO NOT WRITE ABOVE THIS LINE.

**1** TITLE OF THIS ☐ NEWSPAPER ☑ NEWSLETTER AS IT APPEARS ON THE COPIES ▼ City/State▼

OIL DAILY Incorporating ENERGY ALERT New York, NY

If no previous registration under identical title, check here ☐

| Month and year date on copies ▼ | Number of issues in this group ▼ | ISSN▼ | Edition▼ |
|---|---|---|---|
| June 2008 | 21 | 1529-4366 | 58 |

**2** NAME AND ADDRESS OF THE AUTHOR/COPYRIGHT CLAIMANT IN THESE WORKS MADE FOR HIRE

Energy Intelligence Group (UK) Limited
Holborn Towers, 8th Floor
137-144 High Holborn
London WC1V 6PW United Kingdom

Energy Intelligence Group, Inc.
5 East 37th Street
5th Floor
New York, NY 10016-2807

AUTHOR'S CONTRIBUTION (check all that apply)

☑ Editing ☐ Compilation ☑ Text ☑ Other Pictorial and graphical content

**3** DATE OF PUBLICATION OF THE FIRST AND LAST ISSUES IN THIS GROUP Important: Give month, day, and year

(First) June 2 2008 (Month ▲ Day▲ Year▲) (Last) June 30 2008 (Month ▲ Day▲ Year▲)

CERTIFICATION*: I, the undersigned, hereby certify that I am the copyright claimant or the authorized agent of the copyright claimant of the works identified in this application, that all the conditions specified in the instructions on the back of this form are met, and that the statements made by me in this application are correct to the best of my knowledge.

Handwritten signature (X) Deborah A Brown    Typed or printed name of signer Deborah A. Brown

PERSON TO CONTACT FOR CORRESPONDENCE ABOUT THIS CLAIM

Name Deborah A. Brown

Daytime telephone number ( 212 )532-3405 ext. 1124

Address (if other than given below)

Fax 212-532-4479 Email dbrown@energyintel.com

DEPOSIT ACCOUNT

Account number DA083550

Name of account Energy Intelligence Group

Certificate will be mailed in window envelope to this address

Name▼ Energy Intelligence Group / Attn; Ms. Deborah A. Brown

Number/Street/Apt ▼ 5 East 37th Street, 5th Floor

City/State/ZIP▼ New York, NY 10016-2807

YOU MUST:
• Complete all necessary spaces
• Sign your application

SEND ALL 3 ELEMENTS IN THE SAME PACKAGE:
1. Application form
2. Nonrefundable filing fee in check or money order payable to *Register of Copyrights*
3. Deposit material

MAIL TO:
Library of Congress, Copyright Office
101 Independence Avenue, S.E.
Washington, D.C. 20559-6000

Fees are subject to change. For current fees, check the Copyright Office website at www.copyright.gov, write the Copyright Office, or call (202) 707-3000

*17 U.S.C. §506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

# EXHIBIT C

#12607

# MASTER LICENSE AGREEMENT

This MASTER LICENSE AGREEMENT (this "Agreement") is made and entered into as of the date set forth on the signature page below, by and between Energy Intelligence Group, Inc. ("EIG"), and the undersigned party (the "Licensee").

The services to be provided hereunder by EIG shall be indicated and described on a Schedule A. Services may be added pursuant to a document executed by Licensee which references this Agreement and is in a format similar to Schedule A. Each Schedule A, together with the terms of this Agreement, shall constitute a separate agreement for the services specified in such Schedule A ("Services License Agreement").

Services may be ordered pursuant to this Agreement by Licensee's present and future "Affiliates", as though such Affiliates were Licensee under this Agreement. In such event, the applicable Affiliate(s) executing the applicable Schedule A shall be considered the Licensee for such agreement and such Services License Agreement shall be deemed to be a separate agreement between EIG and such Affiliate. Licensee's "Affiliates" shall be deemed to include all entities controlled by, controlling, or under the common control of Citigroup Inc.

For good and valuable consideration, the parties hereby agree as follows:

**1.0 DEFINITIONS.**

1.1 "Information" means the text and data of the EIG publications and, if applicable, a historical textual and/or numerical archive for such publications, set forth on the applicable Schedule A attached hereto, which may be delivered or accessed through the following: electronic mail, print, facsimile or EIG's web site www.energyintel.com, as set forth on the applicable Schedule A attached hereto.

1.2 "Service" means the usage of the Information, according to the terms set forth herein.

1.3 "Site" means the location(s), set forth on the applicable Schedule A attached hereto, for delivery of or access to the Information.

1.4 "User" means the individual(s), entity or number of individuals set forth on the applicable Schedule A attached hereto.

**2.0 SERVICE.**

2.1 In consideration of the License Fee (the "Fee") set forth on the applicable Schedule A attached hereto and the terms and conditions herein, EIG agrees to provide the Service to the Licensee for the Site and its Users.

2.2 Contents. The Service includes Information updated to the most recent issue date of the publications contained in the Information. EIG reserves the right to modify the frequency and content of the Information provided through the Service at any time.

2.3 Usage. The Licensee is permitted to use the Service and provide access to the Information to Users at the Site. The Licensee is solely responsible for arranging and paying for its connection to the Service, and furnishing any necessary hardware and software to effect such connection. Licensee may change the location of the Site at no additional cost provided that Licensee's volume of usage does not increase as a result of the location change. EIG shall cooperate with Licensee as Licensee may reasonably request in connection with any such change.

**3.0 USE OF INFORMATION.** Subject to the terms and conditions herein, Licensee, as part of and in the ordinary course of business, is permitted to use, provide and distribute (orally, in writing, electronically or otherwise) to its Licensees and suppliers and for its own business applications, reports, presentations, analytics, formulae, graphs, algorithms and other publications which incorporate, utilize or display excerpts of text or data contained within the publications that are made accessible via the Service. Licensee must cite EIG and the originating publication as the source when it uses any such information in the foregoing manner. Licensee is strictly prohibited from reproducing or

M 9/13/4

Energy Intelligence

EIG LICENSE AGREEMENT (cont.)

copying (photo statically, electronically, by means of forwarding electronically, via facsimile or otherwise) entire issues, or systematically or routinely extracting or printing stories and distributing such copies and/or extracted stories (including without limitation, posting on local area or wide area networks) to individuals or entities who are not Users, or otherwise acting in violation of United States copyright laws. The restrictions on the use of Information and number of Users set forth in this Agreement shall survive termination of this Agreement, unless the parties hereto agree otherwise by a subsequently duly executed Agreement. Without limiting the foregoing, EIG agrees that Licensee may retain any Information received under the Service prior to termination or cancellation of this Agreement, subject to the terms and conditions of use set forth above.

The restrictions on the use of Information and the number of Users set forth in this Agreement shall survive termination of this Agreement, unless the parties hereto agree otherwise by a subsequent duly executed agreement. Without limiting the foregoing, EIG agrees that Licensee may retain any Information received under the Service prior to termination or cancellation of this Agreement, subject to the terms and conditions of use set forth above.

4.0 **DISCLAIMER AND LIMITATION OF LIABILITY.** While EIG shall use reasonable efforts to provide up-to-date and accurate information, EIG makes no warranties or representations as to the accuracy of the Information and assumes no liability or responsibility for any errors or omissions in the Information.

4.1 Licensee expressly acknowledges and agrees that use of the Service is at its own risk. All Information available through the Service is provided on an "AS IS" basis. EIG makes no warranty that the Service will meet the Licensee's requirements, be uninterrupted, secure or error free.

4.2 The Service may contain facts, views, opinions, statements and recommendations of third-party individuals, entities or organizations. EIG does not represent, warrant or endorse the accuracy, timeliness or reliability of any advice, opinion, statement or other information displayed, uploaded or distributed through the Service. Licensee acknowledges and agrees that any reliance upon such opinion, advice, statement or information is at its sole risk.

4.3 EIG SPECIFICALLY DISCLAIMS ANY AND ALL WARRANTIES, EXPRESS OR IMPLIED, REGARDING THE SERVICE OR ANY INFORMATION PROVIDED THROUGH OR IN CONNECTION WITH THE SERVICE, INCLUDING WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, AND WARRANTIES AS TO THE ACCURACY, COMPLETENESS OR CONTENT OF ANY INFORMATION AVAILABLE ON OR THROUGH THE SERVICE.

4.4 Except as provided in Section 4.6, in no event shall EIG, its affiliates, employees, agents or representatives be liable for any indirect, consequential, special, incidental or punitive damages (including, without limitation, errors or omissions in the Information) in connection with this Agreement or in the use of the Service.

4.5 Except as provided in Section 4.6, IN NO EVENT SHALL LICENSEE (OR ANY AFFILIATE) BE LIABLE FOR LOST PROFITS OR REVENUES OR FOR SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES, REGARDLESS OF THE FORM OF ACTION (INCLUDING NEGLIGENCE AND STRICT LIABILITY), WHETHER OR NOT IT HAS BEEN ADVISED OF OR OTHERWISE MIGHT HAVE ANTICIPATED THE POSSIBILITY OF SUCH DAMAGES.

4.6 NOTHING CONTAINED IN THIS AGREEMENT SHALL LIMIT A PARTY'S LIABILITY FOR ANY CLAIM RESPECTING THEIR GROSS NEGLIGENCE, BAD FAITH, WILLFUL MISCONDUCT, OR INTENTIONAL BREACH OF THIS AGREEMENT, OR ANY CLAIM FOR PERSONAL INJURY OR PROPERTY DAMAGE ARISING OUT OF THE NEGLIGENCE OF SUCH PARTY OR ITS EMPLOYEES, AGENTS OR SUBCONTRACTORS OR FOR DAMAGES ARISING IN RESPECT OF CLAIMS UNDER SECTIONS 5 (Indemnity) OR 9 (Confidentiality).

**5.0 INDEMNITY.**

(a) EIG hereby agrees to indemnify, defend and hold harmless Licensee, its officers, directors, employees, affiliates and representatives from and against any and all actions, causes of action, suits, damages, liabilities, losses, claims and demands of whatever kind or nature, at law or in equity, directly or indirectly, that are brought by a third party against Licensee arising out of or in any way related to EIG's violation of any material terms and conditions of this Agreement, including without limitation breaches of the warranties set forth in Section 10 (Intellectual Property Warranty).



M 9/13/04

Energy Intelligence

EIG LICENSE AGREEMENT (cont.)

(b) Licensee hereby agrees to indemnify, defend and hold harmless EIG, its officers, directors, employees, affiliates and representatives from and against any and all actions, causes of action, suits, damages, liabilities, losses, claims and demands of whatever kind or nature, at law or in equity, directly or indirectly, that are brought by a third party against EIG, arising out of or in any way related to Licensee's violation of any material terms and conditions of this Agreement.

6.0 **ASSIGNMENT.** Licensee may assign its rights or obligations under this Agreement (or a Service License Agreement): to a corporation, or other entity, that acquires all or substantially all of Licensee's assets or business; or to any Licensee Affiliate. Any license granted to Licensee under this Agreement may be transferred to any permitted assignee of Licensee under the terms of the Agreement.

Any department, division or Affiliate of Licensee and/or an Affiliate that loses its status as such, shall have the right to use the Service licensed or provided hereunder for a period the lesser of: (i) two (2) years; or (ii) the remainder of the then current term; with an annual option to renew for a maximum of two (2) additional years after the loss of its status as a department, division or Affiliate of Licensee and/or an Affiliate at no additional cost.

If Licensee directly or indirectly acquires a company or a department, division or a line of business of a company ("the Acquired Company") that has assigned to Licensee its licenses for EIG's services in accordance with the terms of a separate agreement between Licensee and the Acquired Company, Licensee, at its sole option, may elect to have such services become subject to the terms and conditions of this Agreement. Licensee may make such election by providing notice to EIG as provided in Section 11 (Notices) hereof, without incurring additional fees associated with such transfer of license(s). The Acquired Company's agreement with EIG for the transferred license(s) shall terminate immediately upon Licensee's exercise of its election and the terms and conditions of this Agreement shall be the controlling document.

7.0 **TERM AND TERMINATION.**

7.1 This term of each Service License Agreement will be set forth on the applicable Schedule A attached hereto.

7.2 The initial term of this Master License Agreement shall be one year, and shall automatically renew for additional one-year periods. After the initial term, either party may terminate this Master License Agreement upon ninety (90) days prior written notice. Termination of this Master License Agreement shall not act to terminate any Service License Agreement that is still in effect.

7.3 In addition to the foregoing, this Master License Agreement and each Service License Agreement may be terminated immediately:

(a) by EIG if Licensee fails to pay any Fee when due, directly or indirectly permits any unauthorized use of the Service (including, without limitation, unauthorized Users or Sites), files or has filed against it a petition in bankruptcy, or commits any other material breach of this Agreement, and such condition continues for a period of thirty (30) days after receipt of notice from EIG of such condition; or

(b) by Licensee if EIG fails to provide the Information when due under this Agreement, files or has filed against it a petition in bankruptcy, or upon any other material breach of this Agreement, and such condition continues for a period of (30) days after receipt of notice from Licensee of such condition.

7.4 Unless and until a particular Service License Agreement is terminated in accordance with the terms thereof, no Services or licenses shall be discontinued by EIG.

7.5 The provisions of Articles 3, 4, 5, 6, 7, 9, 10, 11, 14, 15, and 16 shall survive any termination or expiration of this Agreement and each Service Agreement.

8.0 **FEES AND PAYMENT.** In consideration of the Information received through the Service and the terms and conditions herein, Licensee agrees to pay EIG the Fee set forth on the applicable Schedule A. EIG shall provide Licensee an invoice for the Fee set forth on the applicable Schedule A in accordance with such Schedule A, and, if not in bona fide dispute, such invoices shall be due sixty (60) days following receipt of invoice by Licensee. In no event



9/13/04






shall Licensee be liable for any late or finance charges of any kind. All Fees will be based on the prices set forth in Schedule B (attached hereto and hereby incorporated by reference). The prices set forth in Schedule B will remain firm for the initial year of this Agreement, shall not be increased more than once a year thereafter, and no such increase may exceed five percent (5%). EIG reserves the right to raise the Fee in the event of an increase in the number of Users (in which case the prices set forth in the then current Schedule B shall apply). In no event shall the Fees charged to Licensee exceed those charged any other Licensee or client of EIG.

EIG further agrees that Licensee shall not be liable for personal property taxes, franchise taxes, corporate excise, privilege or license taxes or based on the net income or gross revenues of EIG or any other taxes paid or payable by EIG which are not required by law to be collected from Licensee. Invoices shall be addressed to: Accounts Payable, 3800 Citibank Center, G3-01, Tampa, Florida 33610.

Notwithstanding anything to the contrary set forth in this Agreement, Licensee shall have no liability for any charges under the Agreement until such time as the Service is completely delivered (or, if applicable made available) to Licensee in conformity with all applicable specifications.

**9.0 CONFIDENTIALITY.** The parties hereto acknowledge that during the term of this Agreement, each of them will have access to and become acquainted with information of a confidential, proprietary and secret nature belonging or pertaining to the other party's business (the "Confidential Information"), including, without limitation, its pricing, product development, production methods, and its clients. The parties hereby covenant and agree not to directly or indirectly use (except as contemplated hereby for the purposes of this Agreement), make known or otherwise disclose to any individual or entity any Confidential Information . EIG further agrees not to disclose the identity of Licensee or its Affiliates as a Licensee of EIG without their prior written consent. EIG agrees to notify its agents, employees and subcontractors of this confidentiality requirement and to obligate them to abide by it.

EIG acknowledges and agrees that Licensee may suffer irreparable injury not compensable by money damages for which Licensee will not have an adequate remedy at law in the event of the unauthorized use or disclosure of said information or materials, and therefore Licensee shall be entitled to injunctive relief to restrain such unauthorized use or disclosure, threatened or actual. The foregoing shall be in addition to any other rights Licensee may have under this Agreement, at law or in equity. In addition, EIG agrees, upon learning of or upon a showing by Licensee of such threatened or actual disclosure by its agents, employees or subcontractors, to notify Licensee thereof and to join Licensee, at Licensee's request, in seeking appropriate injunctive relief against the applicable agents, employees or subcontractors. EIG agrees that it and all of its agents, employees or subcontractors having access to Licensee's, its Affiliates', or any of their respective clients' information shall: (i) maintain, and cause their employees to maintain, the confidentiality of all such information; and (ii) use such information only for the purposes expressly set forth under this Agreement. In no event shall EIG or its agents, employees or subcontractors release or disclose any such information to any third party unless: (i) expressly set forth in this Agreement, (ii) otherwise approved in writing by Licensee and/or the applicable Affiliate or client, or (iii) required by law or regulation, provided further that if so disclosed or released, EIG and its agents, employees and/or subcontractors shall ensure that the confidentiality of such information is maintained. At the expiration or termination of this Agreement, or upon Licensee's earlier request, EIG shall return all Licensee's, its Affiliates', and any of their respective clients' information. EIG shall permit Licensee (or its applicable Affiliate) to audit for its compliance with the above obligations.

This Section 9 shall survive termination of this Agreement.

**10.0 INTELLECTUAL PROPERTY WARRANTY.** EIG represents and warrants that (i) the Information and other products and Services provided to Licensee pursuant to this Agreement do not infringe or misappropriate any third-party rights in any trade secret, trademark, patent or copyright, or any other proprietary right; (ii) and that there are currently no claims by any third-party which, if upheld, would impair EIG's right to enter into this Agreement, and (iii) there are currently no claims, and no claims pending or threatened by any person against EIG or, to EIG's knowledge, any licensee of EIG alleging any matter contrary to the foregoing items (i) or (ii).







**11.0 NOTICES.** All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be delivered in person, by registered or certified mail (postage prepaid, return receipt requested) to the respective parties as follows:

If to EIG:

Energy Intelligence Group, Inc.
5 East 37th Street, 5th Floor
New York, New York 10016-2807
Attention: Deborah Brown
Fax: (212) 532-4479

If to Licensee to the address set forth on Schedule A attached hereto, with a copy to the following address:

Citigroup Global Markets Inc.
388 Greenwich Street
New York NY 10013
Attn: Vivian A. Maese, Esq.
Office of the General Counsel

Any such notice shall be deemed delivered, given and received for all purposes as of (i) the date so delivered, if delivered personally, or (ii) on the date of receipt indicated on the return receipt, if sent by registered or certified mail or courier.

**12.0 FORCE MAJEURE.** Neither party hereto shall be liable to the other party for any damage or any failure to perform any obligation under this Agreement if such damage or failure has arisen from a "Force Majeure." For purposes of this Agreement, "Force Majeure" shall mean any cause beyond the reasonable control of the parties, including, without limitation, industrial disputes of whatever nature, acts of God, war, riot, civil commotion, malicious damage, compliance with any law or governmental order, rule regulation or direction, accident, break-down of plant or machinery, fire, flood, storm, power failure, telecommunications disruption or failure, or equipment failure.

**13.0 ENTIRE AGREEMENT; AMENDMENTS.** This Agreement along with all schedules attached hereto contains the complete and exclusive statement of the agreement between the parties, and supersedes any prior proposals, understandings and other agreements, oral or written, between the parties relating to the subject matter hereof. This Agreement may not be modified, altered or amended except by written instrument (not to include e-mail or other electronic transmissions) duly executed by an authorized representative of both parties hereto. The provisions of this Agreement shall supersede the provisions of any shrink-wrap, clickwrap or other license or contract provisions included with the Service or other products provided hereunder, and such shrink-wrap, clickwrap or other license or contract provisions shall have no binding effect upon the parties even if a User or authorized officer of Licensee purports to have affirmatively accepted such provisions.

**14.0 WAIVER.** Any failure by either party to exercise any right created hereunder shall not constitute a waiver by that party of such right. No waiver of either party of any provision of this Agreement shall be deemed, or will constitute, a waiver of any other provision, nor will any waiver constitute a continuing waiver. No waiver will be binding unless executed in writing by the party making the waiver.

**15.0 SEVERABILITY.** If any provision of this Agreement is invalid, illegal or unenforceable under any applicable statute or rule of law, it is to be deemed omitted. The remainder of the Agreement shall be valid and enforceable to the fullest extent permitted by law.

**16.0 GOVERNING LAW.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York, without regard to its conflicts of law principles. EIG hereby irrevocably consents to the exclusive jurisdiction of, and venue in, and federal or state court of competent jurisdiction located in the borough of Manhattan, New York City.

**17.0 DOWNTIME POLICY.** In the event that the services provided to Licensee by EIG pursuant to this Agreement are not available to Licensee for any reason for more than, in the aggregate, one percent (1%) of the "Available Time" (as defined below) during any thirty (30) day period, EIG shall provide a credit to Licensee. Such credit will be the amount equal to the product of the total amount of charges otherwise payable under this Agreement



9/13/04




EIG LICENSE AGREEMENT (cont.)

during such thirty (30) day period for the affected Services multiplied by the percentage of "Unavailable Time" (as defined below) during such period; provided, however, that the foregoing credit shall only be available in respect of any interruptions in the Services as to which Licensee has notified EIG promptly following interruptions. Unless otherwise indicated, "Available Time" shall be the hours between 7:00 A.M. and 7:00 P.M. on any business day, within the local time zone and "Unavailable Time" shall mean the number of hours (expressed as a fraction, if not a whole number) during which the services were not available to Licensee during the "Available Time".

18.0 **SERVICE SUPPORT.** EIG shall use due care in providing the Services to Licensee. Upon EIG's receipt of notice from Licensee of an error or service problem with the Service, EIG shall promptly, and in any event within two (2) hours of EIG's receipt of such notice, initiate diagnostic and remedial measures, using qualified employees to correct such error or problem and EIG shall work diligently until such error or problem is corrected. If Licensee notifies EIG that any such error or service problem materially impairs Licensee's use of any Service EIG shall immediately initiate such diagnostic and remedial measures and EIG shall work continuously until such problem or error is corrected.

19.0 **EXPORT CONTROLS.** EIG hereby represents and warrants that it will comply with the requirements of all applicable export laws and regulations, including but not limited to the U.S. Export Administration Regulations, in the performance of Services under this Agreement. It is understood that countries other than the U.S. may restrict the import or use of strong encryption products and may restrict exports, and therefore EIG agrees that it shall be solely responsible for compliance with any such import or use restriction. EIG agrees to indemnify and hold harmless Licensee from any costs, penalties or other losses caused by, or related to, any violation or breach of this provision.

20.0 **DIVERSITY.** EIG acknowledges that Licensee has implemented a Supplier Diversity Program that, amongst other initiatives, encourages the use of minority and women-owned ("Diverse Suppliers") businesses as suppliers and subcontractors to the fullest possible extent consistent with the efficient performance of its business strategies. To assist Licensee in complying with these goals, if EIG currently provides any reports tracking its use of Diverse Suppliers in the provision of products, goods or services, to any other of its Licensees, then EIG will provide (at no additional cost) copies of such reports, whenever they are prepared and updated, to Licensee. These reports shall be forwarded to the attention of the Citigroup Supplier Diversity Program, One Court Square, Long Island City, New York 11120, attention Director Supplier Diversity Program.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date set forth below.

| **ENERGY INTELLIGENCE GROUP, INC.** | **LICENSEE – CITIGROUP GLOBAL MARKETS INC.** |
|---|---|
| By: Thomas Wallin [signature] | By: [signature] |
| Title: President | Title: GINA TONG Senior Vice President Market Data |
| Date: September 13, 2004 | Date: 9/13/04 |



EIG LICENSE AGREEMENT (cont.)

SCHEDULE A

Licensee's Company Name: Citigroup Global Markets Inc.
Licensee's Contact Name:
Licensee's Address: 388 Greenwich Street, New York, NY 10013
Telephone:
Email:

Site(s): To be determined

Name(s) of User(s) (if applicable): ____________

| Titles of Publications: | # of Users | Dates: | Delivery Method(s): |
|---|---|---|---|
| Daily Price Snapshot (DPS) | | | |
| Energy Compass (ECW) | | | |
| Energy Intelligence Briefing (EIB) | | | |
| International Oil Daily (IOD) | | | |
| International Petroleum Finance (IPF) | | | |
| **Jet Fuel Intelligence (JFI)** | 3 | 01/09/04 to 31/08/05 | Web or Email |
| **Natural Gas Week (NGW)** | 1 | 01/09/04 to 31/08/05 | Web or Email |
| NGW DataSource (NGWDPSS) | | | |
| Nefte Compass (NCM) | | | |
| Oil Market Intelligence (OMI) | | | |
| OMI DataSource(OMIDSS) | | | |
| Petroleum Intelligence Weekly (PIW) | | | |
| The Oil Daily(TOD) | | | |
| World Gas Intelligence (WGI) | | | |
| WGI DataSource (WGIDSS) | | | |
| The International Crude Oil Market Handbook | | | |
| The Almanac of Russian & Caspian Petroleum | | | |
| The EIG Top 100: Ranking the World's Oil Cos. | | | |
| The World Gas Handbook | | | |
| Iraqi Oil & Gas: A Bonanza Still in Waiting | | | |
| Russian Caspian Data Source (SRSS) | | | |
| Oil Supply Dilemma (SRDS) | | | |

Term: September 13th, 2004 through September 12, 2005.

License Fee: ____________

Accepted and agreed to as of the 13th day of Sept. 2004 .

ENERGY INTELLIGENCE GROUP, INC.

By: Thomas Wallin *Thomas Wallin*

Title: President

Date: 9/13/04

LICENSEE: CITIGROUP GLOBAL MARKETS INC.

By: Gina Tong *[signature]*

GINA TONG
Senior Vice President
Market Data

Title: ____________

Date: 9/13/04

# EIG LICENSE AGREEMENT

## SCHEDULE A

## TO THE MASTER LICENSE AGREEMENT DATED SEPTEMBER 13, 2004

This schedule A is entered as of the accepted date set forth below, by and between Energy Intelligence Group, Inc. ("EIG") and Citigroup Global Markets Inc. ("Licensee"). The parties hereto acknowledge that they are entering into this Schedule pursuant to the provisions of the Master License Agreement dated as of September 13, 2004, between Energy Intelligence Group, Inc. and Citigroup Global Markets Inc. The parties further acknowledge and agree that the provisions of the Master Agreement shall apply to this Schedule as though such provisions were set forth herein in their entirety

**Licensee's Company Name:** Citigroup Global Markets Inc.
**Licensee's Contact Name:** Alison Faustin
**Licensee's Address:** 388 Greenwich Street
31st Floor
New York, NY 10013
**Telephone:** 212-816-9227
**Email:** Alison.faustin@citi.com

**Site(s):** 2 (New York, NY)

**Names of Users (if applicable):**

Faisel Khan
Geoff Kieburtz

| Titles of Publications: | # of Users | Dates: | Fee: | Delivery Method: |
|---|---|---|---|---|
| Oil Daily | 1 | 07/03/07 – 07/02/08 | | Email (pdf) |
| Natural Gas Week | 1 | 05/01/07 – 07/02/08 | | Email (pdf) |

Term: See Above Dates.

License Fee:

Accepted and Agreed to as of 7/23/2007:

**ENERGY INTELLIGENCE GROUP, INC.**

By: Deborah A. Brown

Signature: Deborah A Brown

Title: Account Services Manager

Date: 7/26/07

**CITIGROUP GLOBAL MARKETS INC.**

By: [signature]

Signature: GINA [illegible] Senior Vi[illegible] President Market Data

Title:

Date: 7/23/07



**EIG LICENSE AGREEMENT**

**SCHEDULE A**

**TO THE MASTER LICENSE AGREEMENT DATED SEPTEMBER 13, 2004**

This schedule A is entered as of the accepted date set forth below, by and between Energy Intelligence Group, Inc. ("EIG") and Citigroup Global Markets Inc. ("Licensee"). The parties hereto acknowledge that they are entering into this Schedule pursuant to the provisions of the Master License Agreement dated as of September 13, 2004, between Energy Intelligence Group, Inc and Citigroup Global Markets Inc. The parties further acknowledge and agree that the provisions of the Master Agreement shall apply to this Schedule as though such provisions were set forth herein in their entirety.

**Licensee's Company Name:** Citigroup Global Markets Inc.
**Licensee's Contact Name:** Alison Faustin
**Licensee's Address:** 388 Greenwich Street, 31st Floor, New York, NY 10013
**Telephone:** 212-816-9227
**Email:** Alison.faustin@citi.com

**Site(s):** 2 (New York, NY)

**Names of Users (if applicable):**

Faisel Khan
Geoff Kieburtz

| Titles of Publications: | # of Users | Dates: | Fee: | Delivery Method: |
|---|---|---|---|---|
| Oil Daily | 1 | 07/03/08 – 07/02/09 | | Email (pdf) |
| Natural Gas Week | 1 | 07/03/08 – 07/02/09 | | Email (pdf) |

Term: 1 year.

License Fee:

Accepted and Agreed to as of 4/17/08:

**ENERGY INTELLIGENCE GROUP, INC.**

By: DEBORAH A. BROWN
Signature: Deborah A Brown
Title: ACCOUNT SERVICES MGR
Date: ~~AP~~ MAY 13, 2008

**CITIGROUP GLOBAL MARKETS INC.**

By: Arthur DiMeglio
Signature:
Title: Arthur J. DiMeglio, Senior Vice President, Citi Procurement Services, Information Services, 212 615 8315
Date:



# EXHIBIT D

**Gladys Infante**

**From:** Healy, Susan [susan.healy@citi.com]
**Sent:** Friday, June 13, 2008 4:45 PM
**To:** Customer Service
**Subject:** FW: Oil daily - GK has subscription ...



de080613.pdf (279 KB)

Hello,

Please change the sent to on the attached going forward to my attention as Frances Petito will no longer be with our department.
I will be the new contact person, Susan Healy.

Thank you very much,
Susan Healy

-----Original Message-----
From: Petito, Frances [GWM-CIR]
Sent: Friday, June 13, 2008 9:18 AM
To: Healy, Susan [GWM-CIR]
Subject: Oil daily - GK has subscription.....

y Geoff Kiebartz

Since GK gets the bills on these, pls change these over to have the emails go directly to you and no longer to me....the contact person should be on the bill, contact them via email, so you can track.

Emails should go to Faisel and Robin when these arrive daily

Richard and Jason want hard copies, so copy for them and put on their desks.

Limit the # of email sent, as this is not supposed to be emailed in the first place.

-----Original Message-----
From: Energy Intelligence [mailto:eigcirculation@networkats.com]
Sent: Thursday, June 12, 2008 7:04 PM
To: Petito, Frances [GWM-CIR]
Subject: The Oil Daily, June 13, 2008 (pdf)

CUSTOMER SERVICE:
For any delivery problems, or changes in address, simply e-mail CustomerService@energyintel.com Please be sure to include full subscriber/company name and address in your e-mail.

For more information on EIG, visit www.energyintel.com

VIEWING .PDF DOCUMENTS:
Use the Adobe Acrobat Reader to view an attached PDF document in its full graphic format, that is, exactly as it is printed. If you don't have Adobe Acrobat Reader installed, you can download it from the internet: http://www.adobe.com Follow the links at Adobe''s web site to Acrobat Reader.
Once Acrobat Reader is installed, save the .PDF document to your disk, open Adobe Acrobat Reader and then open the .PDF document.